United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CHRISTOPHER DITTENHAFER,

        Plaintiff,

    v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

Case No. 3:15-cv-00214- LB

**ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**[ECF Nos. 21 & 22]**

## INTRODUCTION

The plaintiff Christopher Dittenhafer moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying him disability benefits for his claimed disabilities of degenerative joint disease of the left knee, anxiety disorder, major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), and methamphetamine abuse in sustained remission. (Motion for Summary Judgment, ECF No. 21.[1]) The Administrative Law Judge ("ALJ") found that the five impairments above were severe impairments but declared Mr. Dittenhafer not disabled and denied Social Security Income ("SSI") benefits. (Administrative Record ("AR") at 13.) The Commissioner opposes Mr. Dittenhafer's motion for summary

---

[1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page numbers at the tops of the documents.

1   judgment and cross-moves for summary judgment. (Cross-Motion, ECF No. 22.)

2       Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

3   without oral argument. All parties have consented to this court's jurisdiction. (Consent Forms,

4   ECF Nos. 10, 12.) Upon consideration of the administrative record, the parties' briefs, and the

5   applicable legal authority, the court grants the plaintiff's motion, denies the Commissioner's

6   cross-motion, and remands for further administrative proceedings.

7                                   **STATEMENT**

8   **I. PROCEDURAL HISTORY**

9       Mr. Dittenhafer was initially found disabled by the Social Security Administration as of March

10  1, 2004, based on a diagnosis of affective disorder. (Administrative Record ("AR") 9-11.) On

11  March 14, 2011, the Social Security Administration issued a decision finding the plaintiff no

12  longer disabled as of March 2011 and stating that his Social Security disability benefits would

13  end. (AR 87-88.) On May 9, 2011, Mr. Dittenhafer sought reconsideration of decision to end his

14  benefits. (AR 94.) On July 20, 2012 the Social Security Administration upheld its previous

15  decision (AR 122.)

16      Mr. Dittenhafer filed a timely "Request for Hearing by Administrative Law Judge" on July 31,

17  2012. (AR 127.) On May 23, 2013, the ALJ conducted a hearing in San Francisco. (AR 9.) Mr.

18  Dittenhafer was present at the hearing and was represented by counsel Ananda Clarke. (*Id.*)

19  Vocational Expert ("VE") John Kilcher also testified at the hearing. (*Id.*)

20      The ALJ issued an order on June 14, 2013 denying benefits, finding that Mr. Dittenhafer was

21  no longer disabled. (AR 6-23). Mr. Dittenhafer appealed that decision on August 2, 2013. (AR 5.)

22  The Appeals Council denied that appeal in a decision dated November 14, 2014. (AR 1-4.)

23      Mr. Dittenhafer timely sought judicial review of the final decision denying him SSI benefits.

24  (Complaint, ECF No. 1.) On April 27, 2015, the Commissioner answered the complaint. (Answer,

25  ECF No. 16.) On July 24, 2015, Mr. Dittenhafer filed his motion for summary judgment. (Motion,

26  ECF No. 21.) The Commissioner filed an opposition and cross-motion for summary judgment on

27  August 18, 2015. (Cross-Motion, ECF No. 22.) On August 30, 2015, Mr. Dittenhafer filed a

28  response. (Response, ECF No. 23.)

United States District Court
Northern District of California

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

### A. Medical Records

#### *1. Dr. Lisa Sterman: Treatment Provider*

Mr. Dittenhafer first met with Dr. Sterman on May 16, 2001. (AR 426.) The first mention of any mental health/drug use symptoms are in the notes for June 30, 2003, which report no drug use. (AR 423.)

On October 31, 2003, Dr. Sterman's treatment notes state that Mr. Dittenhafer tried to go back to work but he was relocated to an office in a supermarket that made him feel nauseated. (*Id.*) Mr. Dittenhafer reported that he could not focus at work and that he was depressed, anxious, and unable to sleep. The notes further state that Mr. Dittenhafer would start Paxil and would see a specialist, Dr. Morello, to address substance abuse. (*Id.*)

Dr. Dittenhafer saw Dr. Sterman on November 21, 2003. (AR 422.) He had a "minor speed relapse." He had started Paxil but it was not effective yet. (*Id.*) Mr. Dittenhafer had not yet seen Dr. Morello. (*Id.*)

On March 11, 2004, Mr. Dittenhafer reported that he was having "some trouble" with anxiety. (AR 421.) He had been off speed for three weeks. (*Id.*) He was not sleeping well. (*Id.*) Mr. Dittenhafer was still taking Paxil, and Dr. Sterman added Remuron. (*Id.*)

On April 13, 2004, Mr. Dittenhafer reported to Dr. Sterman that he was doing well in recovery with one "slip up" in the last couple of months. (AR 420.) Mr. Dittenhafer was sleeping better but was still dealing with issues and depression. (*Id.*)

Mr. Dittenhafer next saw Dr. Sterman on May 10, 2004. (AR 419.) The notes state that he was doing well and staying clean and getting good social support. Mr. Dittenhafer was returning to work on June 1, 2004. (*Id.*) He reported being anxious and depressed and having insomnia. (*Id.*) Mr. Dittenhafer was still taking Paxil and Remeron and was attending weekly therapy. (*Id.*)

On October 26, 2004, Mr. Dittenhafer saw Dr. Sterman. (AR 418.) She stated that he had been "clean" almost 90 days and that he was seeing Dr. Morello regularly. The notes say that Mr. Dittenhafer's mood was stable and that he went off the Paxil because he "felt too good." (*Id.*) Mr. Dittenhafer wanted to try Wellbutrin to address his smoking and his mood. (*Id.*)

United States District Court
Northern District of California

On March 30, 2005, Dr. Sterman reported that Mr. Dittenhafer was "doing really well overall." (AR 417.) He had been drug free for over 18 months and felt very stable on Wellbutrin. (*Id*.) He was still going to therapy. (*Id*.)

On November 3, 2005, Mr. Dittenhafer went back on Paxil. (AR 416.) He had been off speed for over a year. (*Id*.) He was stable on his medications and was in therapy. (*Id*.)

On March 29, 2006, Dr. Sterman reported Mr. Dittenhafer's mood as stable with no drug or tobacco use. (AR 413.)

Mr. Dittenhafer continued to be stable as reported on Dr. Sterman's April 12, 2006 notes. (AR 412.) He was still seeing Dr. Morello and had been off drugs for a "long time." (*Id*.) Mr. Dittenhafer reported that the Wellbutrin had helped his mood and ADD issues. (*Id*.)

On October 24, 2006, Dr. Sterman reported that Mr. Dittenhafer had been "overall doing very well" and that he was stable on his medications. (AR 411.) He was off drugs. (*Id*.) Although his mood was stable he reported some anxiety and feeling "a bit wired." (*Id*.)

On November 8, 2006, Mr. Dittenhafer told Dr. Sterman that the Zoloft was working well and that his daily level of anxiety was lower, but that he was having intermittent, unpredictable panic attacks where his heart would race and he would sweat. (AR 410.) He said that Xanax helped but that it worked too slowly. Dr. Sterman prescribed an orally dissolving medicine, Niravan, for the panic attacks. (*Id*.)

The next time Mr. Dittenhafer discussed his mental state with Dr. Sterman was at his April 24, 2007 appointment. (AR 404.) The treatment notes state that Mr. Dittenhafer would try Klonopin instead of Xanax for anxiety. (*Id*.)

On July 17, 2007, Dr. Sterman reported that Mr. Dittenhafer was "doing well overall" and was stable on his medications. (AR 403.)

On May 7, 2008, the treatment notes state that Mr. Dittenhafer's mood was stable and he had "no drug use for many years." (AR 399.)

When Mr. Dittenhafer saw Dr. Sterman on July 24, 2008, he reported that his anxiety was stable on his medications and that he had not been using drugs. (AR 398.)

The September 11, 2008 notes are signed by a person named Cohen. (AR 397.) They state that

United States District Court
Northern District of California

Mr. Dittenhafer was using recreational drugs. (*Id.*)

Mr. Dittenhafer saw Dr. Sterman on February 17, 2009. (AR 394.)  The treatment notes state that Mr. Dittenhafer was back on disability after being laid off. (*Id.*)

On March 3, 2009, Mr. Dittenhafer reported that he was having anxiety on and off and frequent panic attacks related to job stress. (AR 393.) The doctor prescribed him some additional medication as needed for his anxiety and noted that the Wellbutrin was helping overall with his mood. (*Id.*)

Mr. Dittenhafer saw another doctor in the practice on April 23, 2009.[2]  (AR 390.) The treatment notes state that Mr. Dittenhafer's anxiety was stable and that he had not been using any drugs or having issues. (*Id.*)

On August 24, 2009, Mr. Dittenhafer saw Dr. Sterman. (AR 387.) Mr. Dittenhafer reported "lots of stress" related to a lawsuit against his last employer. (*Id.*) Mr. Dittenhafer was taking Zoloft and also Klonopin, as needed. (*Id.*) He was also taking Wellbutrin. (*Id.*)

On October 22, 2009, Mr. Dittenhafer started taking Strattera for his ADD as prescribed by Dr. Lauzé . (AR 387.)

Mr. Dittenhafer saw Dr. Sterman on January 7, 2010. The treatment notes state that Mr. Dittenhafer had been using speed intermittently. (AR 386.) He had been seeing a Dr. Lange for treatment and had been taking Strattera, but it was not helping. (*Id.*) He was considering taking Ritalin or Adderal and would discuss it with Dr. Lange. (*Id.*) Dr. Sterman supported this idea. (*Id.*) Mr. Dittenhafer's mood fluctuated with use, but he was stable. (*Id.*)

Treatment notes for February 4, 2010 state that Mr. Dittenhafer was still intermittently using speed. (AR 385.) He was given a trial dosage of Adderal but had not started taking it. (*Id.*) Mr. Dittenhafer reported that he felt his problems and drug use were related to poor focus. (*Id.*) Mr. Dittenhafer was working to find a therapist. (*Id.*) Mr. Dittenhafer agreed to try to not use methamphetamine and to try the Adderal. (*Id.*) Mr. Dittenhafer was taking Wellbutrin for his mood and started taking Zoloft as well. (*Id.*)

---

[2] The doctors signature is illegible

United States District Court
Northern District of California

1    Treatment notes for April 29, 2010 state that Mr. Dittenhafer was "finally clean" and off

2    methamphetamine and that he was seeking a therapist. (AR 384.)  The notes state that he was

3    taking all of his medications and was now on Adderal.  Mr. Dittenhafer appeared anxious but

4    cooperative. (*Id*.) The notes state that Mr. Dittenhafer was "committed to abstinence from illicit

5    use" and that he was taking Klonopin as needed, Zoloft, and Wellbutrin. (*Id.*)

6    Treatment notes for May 4, 2010 state that Mr. Dittenhafer was not using, had a stable mood,

7    and would look for a therapist to address his ADD. (AR 383.)

8    Treatment notes for June 23, 2010 state that Mr. Dittenhafer had stayed clean and was working

9    with a counselor. (AR 382.) The notes say that Mr. Dittenhafer felt well overall and that his mood

10   was stable. (*Id*.)

11   Treatment notes for September 8, 2010, say that Mr. Dittenhafer had been "committed to

12   sobriety" since March of 2010 and that he was going to therapy. (AR 380.) Dr. Sterman said that

13   Adderal was working for Mr. Dittenhafer's ADD, and that she was considering lowering his dose

14   of Wellbutrin. (*Id*.)

15   Mr. Dittenhafer saw Dr. Sterman on October 7, 2010. (AR 379.) The notes state that Mr.

16   Dittenhafer decreased his dose of Wellbutrin with no problems, that he was taking Adderal,

17   sleeping "Ok," and that he was "staying clean. (*Id*.) He was still sober and was in therapy. (*Id*.)

18   Dr. Sterman met with Mr. Dittenhafer on December 13, 2010. (AR 376.) Mr. Dittenhafer was

19   taking Adderal and seeing a therapist for his ADHD. (*Id*.)

20   Dr. Sterman saw Mr. Dittenhafer on July 21, 2011. (AR 648.) Dr. Sterman stated that Mr.

21   Dittenhafer had discontinued his Adderal use for his ADHD and that he reported it was not

22   working well. (*Id*.) Mr. Dittenhafer reported that he had no new drug use. (*Id*.) The doctor

23   discussed with Mr. Dittenhafer the use of a patch treatment for his ADHD. (*Id*.) The treatment

24   notes for August 4, 2011 state that Mr. Dittenhafer would try the patch. (*Id*.)

25   Mr. Dittenhafer met with Dr. Sterman on October 31, 2011. (AR 715.) At that time he reported

26   to Dr. Sterman that he was clean and in treatment. (*Id*.)

27   On January 24, 2012, Mr. Dittenhafer saw Dr. Sterman again. (AR 713.) He reported to Dr.

28   Sterman that he had been clean almost two years and that he was still working on options to go

United States District Court
Northern District of California

back to work. (*Id.*) Mr. Dittenhafer was seeing a therapist and his mood was stable. (*Id.*) He was using a patch for treatment of his ADHD. (*Id.*)

Mr. Dittenhafer saw Dr. Sterman on June 25, 2012. (AR 726.) Mr. Dittenhafer's father had died, and Mr. Dittenhafer was in a low mood. (*Id.*) Dr. Sterman increased Mr. Dittenhafer's dosage of Wellbutrin. Mr. Dittenhafer reported that he had no drug use and he was stable. (*Id.*) The notes state that Mr. Dittenhafer would discuss taking an oral version of Ritalin with Dr. Sverson. (*Id.*)

On August 31, 2012, Mr. Dittenhafer reported to Dr. Sterman that he was still struggling with his mood and was working with a psychiatrist to adjust his medications. (AR 764.) He told Dr. Sterman that he was not using drugs. (*Id.*)

On February 17, 2013, Dr. Sterman notes that Mr. Dittenhafer's anxiety and ADD had improved and that he was working with Dr. Lauzé. (AR 762.) Dr. Sterman stated that Mr. Dittenhafer was stable on his medications. (*Id.*)

### 2. Dr. Cleon Yee: Treating Physician

Mr. Dittenhafer was admitted to the hospital on July 29, 2009 with a cough, fever, and night sweats. (AR 602.) Dr. Yee examined Mr. Dittenhafer and wrote the admission note. (*Id.*) The admission note states that Mr. Dittenhafer's anxiety and depression were well controlled on his usual Wellbutrin dose. (AR 603.)

### 3. Dr. Scott Lauzé: Treating Physician

Dr. Lauzé conducted an initial psychiatric evaluation of Mr. Dittenhafer on October 5, 2009. (AR 589-91.) Mr. Dittenhafer saw Dr. Lauzé for an evaluation of his attentional problems and told Dr. Lauzé that he thought it was time to do something about his ADHD. (*Id.*)

Mr. Dittenhafer was not seeing a therapist at that point, although he had seen Dr. Morello from 2005 to 2007, which had been helpful. (AR 589-90.) Mr. Dittenhafer had trouble staying focused on tasks. (AR 589.) He reported that he could not read books or follow movies or conversations. (*Id.*) Mr. Dittenhafer said that he had attention problems since childhood, but that he thought that his attention problems had gotten worse after his HIV diagnosis. (*Id.*)

Dr. Lauzé stated that Mr. Dittenhafer's presentation was complicated by an "ongoing, active

methamphetamine habit." (*Id.*) Mr. Dittenhafer told Dr. Lauzé that he had used methamphetamine on and off since 1984 and that he had been clean and sober for three and a half years, but then he relapsed. (AR 590.) Mr. Dittenhafer reported that he "smokes, snorts or shoots [methamphetamine] almost daily" but that he could stop if he needed to. (AR 589.) He told Dr. Lauzé that because he is on disability and does not need to work, he "sees little incentive for him to stop his meth use completely." (*Id.*)

Mr. Dittenhafer told Dr. Lauzé that he was experiencing anxiety. (*Id.*) He described it to Dr. Lauzé as a "feeling of dread" with racing thoughts and rapid speech, rapid heartbeat, and a sensation of not being able to breathe. (*Id.*) Mr. Dittenhafer also reported symptoms of depression. (*Id.*) He felt that his "jobless state" was exacerbating his depression and that he felt irritable and impatient. (*Id.*)

Mr. Dittenhafer reported to Dr. Lauzé that he chatted on the computer for long periods of time and cleaned the house a lot. (AR 590.) Mr. Dittenhafer told Dr. Lauzé that he and his partner had been together for over sixteen years. (*Id.*)

As to medications, Mr. Dittenhafer reported that he was taking Wellbutrin, that it was more or less helpful, and that it did not completely resolve his depressive symptoms. (*Id.*) The Welbutrin did not help with Mr. Dittenhafer's ADHD. (*Id.*)  Mr. Dittenhafer also took Xananx, Clonazepam, and Ambien as needed. (*Id.*) Dr. Lauzé prescribed Strattera for Mr. Dittenhafer and referred him to a treatment program. (*Id.*)

Dr. Lauzé had a follow-up visit with Mr. Dittenhafer on December 18, 2009. (AR 592.) Mr. Dittenhafer reported that he did not see any benefit from the Strattera. (*Id.*) Dr. Lauzé spoke to Mr. Dittenhafer about stimulant options and possible interactions with methamphetamine, and Mr. Dittenhafer said that he was almost through using methamphetamine. (*Id.*) Dr. Lauzé increased Mr. Dittenhafer's Clonezepam dosage to help with his reported anxiety. (*Id.*) Dr. Lauzé and Mr. Dittenhafer agreed to reassess whether he could use Ritalin or Adderall after Mr. Dittenhafer had been off methamphetamine longer. (*Id.*)

Dr. Lauzé saw Mr. Dittenhafer on August 28, 2012. (AR 794.) Mr. Dittenhafer reported that he was seeing Dr. Sverson, the psychiatrist. He reported that the Strattera was not working and that

United States District Court
Northern District of California

the patch worked better but burned his skin. (*Id.*) The notes state that Mr. Dittenhafer's father had died and that Mr. Dittenhafer had been going back and forth to Pennsylvania. (*Id.*) The doctors had increased Mr. Dittenhafer's Wellbutrin prescription and that worked "okay" for him. (*Id.*)

Mr. Dittenhafer reported feeling depressed over his father's death. He reported being off methamphetamine for 4-5 years, although the doctor noted that his records reflected that the period was two years. (*Id.*)

Mr. Dittenhafer stated that he felt trapped. (*Id.*) He could get happy but his happiness was short-lived. (*Id.*) Mr. Dittenhafer found it hard to feel hopeful. He was not socializing with his friends and he felt directionless. (*Id.*)

Dr. Lauzé next saw Mr. Dittenhafer on September 28, 2012. (AR 795.) The treatment notes state that Mr. Dittenhafer had some anxiety and stress but a full range of affect, and he was able to laugh. (Id.) Mr. Dittenhafer reported that he had been able to focus more on work, but he was still not thinking as clearly as he would like. (*Id.*)

The next treatment notes from Dr. Lauzé are dated November 16, 2012. (AR 796.) Dr. Lauzé stated that Mr. Dittenhafer was still on the east coast caring for a family member. (*Id.*) Mr. Dittenhafer reported partial improvement in focus and concentration. (*Id.*) He still had problems with motivation, focus, and sustained attention. (*Id.*) Mr. Dittenhafer reported that he was depressed. (Id.) His brother was moving out, and he had to deal with everything on his own. (*Id.*)

On December 13, 2012, Dr. Lauzé's treatment notes state that Mr. Dittenhafer was back in San Francisco temporarily, taking a break from caring for his mother who had Alzheimer's. (AR 797.) Dr. Lauzé notes that Mr. Dittenhafer's depression and ADHD were well-controlled on his current medications. (*Id.*) Dr. Lauzé diagnosed Mr. Dittenhafer with ADD and also a major depressive disorder, recurrent episode, of a moderate degree. (*Id.*)

The last treatment notes from Dr. Lauzé are dated March 14, 2013. (AR 798.) Mr. Dittenhafer reported improvement with his medications. (*Id.*) He was still having difficulty staying focused on tasks for an extended period and had a hard time completing tasks. Dr. Lauzé stated that he would see if a higher dose of medications was helpful. (*Id.*)

United States District Court
Northern District of California

### 4. Dr. Charles McDonald: Treating Physician

Mr. Dittenhafer saw Dr. McDonald, a pulmonary specialist, on December 16, 2010. (AR 574.) As part of his social history, Mr. Dittenhafer reported to Dr. McDonald that he "smoked crack daily for one year around 2009." (*Id.*)  Mr. Dittenhafer also reported occasional social use of alcohol. AR 575.)

### 5. Dr. Danilo Lucila: State Agency Non-Examining Physician

On February 8, 2011, Dr. Lucila completed a Mental Residual Functional Capacity Assessment of Mr. Dittenhafer. (AR 608.) Dr. Lucila found that Mr. Dittenhafer had an organic mental disorder, an affective disorder, and substance addictions disorders. (AR 611.) Dr. Lucila noted ADHD and depression. (AR 612, 614.)

The assessment included the following findings. Dr. Lucila found that Mr. Dittenhafer had a mild limitation on maintaining social functioning. (AR 619.) Dr. Lucila found that Mr. Dittenhafer had moderate limitations on the activities of daily living and in maintaining concentration, persistence, or pace. (*Id.*) The report noted insufficient evidence regarding episodes of decompensation. (*Id.*)

In terms of Mr. Dittenhafer's mental residual functional capacity, Dr. Lucila found that (1) Mr. Dittenhafer was not significantly limited in his ability to remember locations and work-like procedures and to understand and remember very short and simple instructions, and (2) he was moderately limited in his ability to understand and remember detailed instructions. (AR 668.)

In terms of sustained concentration and persistence limitations, Dr. Lucila found that Mr. Dittenhafer was not significantly limited in his ability to do the following: maintain attention and concentration for extended periods; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. (AR 608-09.) Dr. Lucila found that Mr. Dittenhafer was moderately limited in his ability to do the following: carry out detailed instructions; and complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an

unreasonable number and length of rest periods. (AR 608.)

In terms of social interaction, Dr. Lucila found that Mr. Dittenhafer was not significantly limited in his ability to do the following: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and interact appropriately with the general public and to maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (AR 609.)

In terms of adaptation, Dr. Lucila found Mr. Dittenhafer not significantly limited in his ability to do the following: respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id.*)

Dr. Lucila concluded that Mr. Dittenhafer had depression/anxiety and a history of ADHD and substance abuse. (AR 624.) Dr. Lucila noted that Mr. Dittenhafer appeared to have improved, his substance abuse was in remission, and the latest progress notes for him indicated that he was stable. (*Id.*) Dr. Lucila stated that Mr. Dittenhafer appeared to be able to attend to the activities of daily living. Dr. Lucila found that Mr. Dittenhafer could do simple work and that he was medically improved. (*Id.*)

### 6. Dr. Bruce Pither: Social Security Administration Evaluating Physician

Dr. Pither, a Social Security Administration evaluating physician, completed a psychological evaluation report on Mr. Dittenhafer dated October 3, 2011. (AR 664-67.) This report also was signed by Robert McMillan, a registered psychological assistant. (AR 667.) At the ALJ hearing, Mr. Dittenhafer testified that he had met only with Mr. McMillan, not with Dr. Pither. (AR 63.) The report states that it was based on review of evaluations conducted by psychiatrists between 2009 and 2010, a forty-five minute interview, and three tests (the Weschler Adult Intelligence Scale, the Weschler Memory Scale, and the Bender-Gestalt test). (AR 664.)

The report states that Mr. Dittenhafer said in the interview that he hated his family, had no friends, and no romantic relationship. (*Id.*) Mr. Dittenhafer reported isolating himself in his room where he watched TV or surfed the internet. (*Id.*)

United States District Court
Northern District of California

The report notes that Mr. Dittenhafer's ability to remember and express an accurate timeline were severely impaired. (AR 665.) The report states that Mr. Dittenhafer's thought process was disorganized and his thought content was illogical and inappropriate. (AR 667.) Mr. Dittenhafer's insight and judgment appeared inadequate and his self-reporting unreliable. (*Id.*)

The examiner found Mr. Dittenhafer unpleasant and uncooperative, with pressured speech that was sometimes unintelligible. (AR 666.) The report notes that Mr. Dittenhafer's behavior was inappropriate for the setting, giving the example that he was chewing on the paperwork that he brought to the appointment. (AR 666-67.)

The report states that "it is the opinion of the examiner that [Mr. Dittenhafer] spends most of his 'extra' money on prescribed and non-prescribed mind-/mood-altering substances." (*Id.*) The examiner stated that he did not believe Mr. Dittenhafer's report that he had been clean and sober since March 2011. (*Id.*) The examiner pointed to Mr. Dittenhafer's "erratic behavior" and "severely anxious mood" as evidence of long-term, and possibly current, methamphetamine abuse/dependence. (*Id.*) Mr. Dittenhafer also reported marijuana and alcohol use, which the examiner took as further evidence that Mr. Dittenhafer was not "clean and sober." (*Id.*)

The results of the Weschler Adult Intelligence test showed Mr. Dittenhafer to have borderline verbal comprehension, borderline perceptual reasoning, extremely low working memory and extremely low processing speed. (AR 665-66.) On the Bender-Gestalt test, Mr. Dittenhafer scored "extremely low" on the copy subtest and very low on the recall subtest. (AR 666.) On the Weschler Memory Scale test, Mr. Dittenhafer scored "extremely low" in the areas of auditory memory, visual memory, immediate memory, and delayed memory. (*Id.*) He scored "borderline" on visual working memory. (*Id.*)

The report concluded that Mr. Dittenhafer appears "incapable . . . of engaging in even low-skill work activities." (AR 667.) Dr. Pither's report also concluded that Mr. Dittenhafer demonstrated significant functional limitations and that his activities of daily living were restricted by his "Unknown Substance-Induced Mood Disorder, Polysubstance Dependence, medical conditions (and the side effects of the myriad medications he takes for medical and psychiatric conditions) , and cognitive functioning in the Extremely Low range." (*Id.*) The report concludes

United States District Court
Northern District of California

that Mr. Dittenhafer appeared "unable to work" for all of those reasons. (*Id*.)

The report further states that Mr. Dittenhafer "demonstrates significant difficulties in concentrating, persisting and pacing." (*Id*.) The examiner discounted Mr. Dittenhafer's report that when he was working he had been able to understand, carry out, and remember simple instructions and to respond appropriately to co-workers, the public, usual work situations, and changes in a routine work environment. (*Id*.) Finally, the report states that Mr. Dittenhafer was severely limited in his ability to engage in any form of work activity. (*Id*.)

### 7.  *Dr. G. Norbeck: State Agency Non-Examining Physician*

On November 22, 2011, Dr. Norbeck completed two Mental Residual Functional Capacity Assessments of Mr. Dittenhafer. (AR 668, 693.) Dr. Norbeck found that Mr. Dittenhafer had an affective disorder. (AR 671.) He also noted a "substance induced mood disorder" based on Dr. Pither's consultative examination. (AR 674.)

Dr. Norbeck notes that the first assessment "reflects the patient's current psychological capabilities which are impaired because of drug and alcohol abuse. See consult." (AR 670.) The first assessment also states that the evidence of drug/alcohol abuse is "material." (AR 681.) The second assessment reflects Mr. Dittenhafer's "Functional Capacity Clean and Sober." (AR 693.)

The first assessment made the following findings. Dr. Norbeck found that Mr. Dittenhafer had moderate limitations on the activities of daily living and maintaining social functioning. (AR 679.) He found a marked limitation in maintaining concentration, persistence, or pace and no episodes of decompensation. (*Id*.)

In terms of Mr. Dittenhafer's mental residual functional capacity, Dr. Norbeck found that (1) Mr. Dittenhafer was not significantly limited in his ability to remember locations and work-like procedures and to understand and remember very short and simple instructions, and (2) he was moderately limited in his ability to understand and remember detailed instructions. (AR 668.)

In terms of sustained concentration and persistence limitations, Dr. Norbeck found that Mr. Dittenhafer was "not significantly limited" in his ability carry out very short and simple instructions. Dr. Norbeck found that Mr. Dittenhafer was "moderately limited" in his ability to do the following: carry out detailed instructions; sustain an ordinary routine without special

supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. (AR 668-69.) Dr. Norbeck found Mr. Dittenhafer "markedly limited" in his ability to do the following: maintain attention and concentration for extended periods and perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 668-69.)

In terms of social interaction, Dr. Norbeck found that Mr. Dittenhafer was not significantly limited in his ability to do the following: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 669.) He found Mr. Dittenhafer to be "moderately limited" in his ability to interact appropriately with the general public and to maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (*Id.*)

In terms of adaptation, Dr. Norbeck found Mr. Dittenhafer not significantly limited in his ability to respond appropriately to changes in the work setting; aware of normal hazards and to take appropriate precautions; and travel in unfamiliar places or use public transportation. (*Id.*) He found Mr. Dittenhafer "moderately limited" in his ability to set realistic goals or make plans independently of others. (*Id.*)

This first assessment concludes that Mr. Dittenhafer "in incapable of maintaining concentration, persistence , and pace to complete a normal 8 hour workday and 40 hour workweek." (AR 670.)

In the second assessment, which rated Mr. Dittenhafer's functional capacities when clean and sober, Dr. Norbeck made the following findings. Dr. Norbeck found that Mr. Dittenhafer had mild limitations on the activities of daily living. (AR 690.) He had moderate limitations on maintaining social functioning and on maintaining concentration, persistence, or pace. (*Id.*)

In terms of Mr. Dittenhafer's mental residual functional capacity, Dr. Norbeck found that (1) Mr. Dittenhafer was not significantly limited in his ability to remember locations and work-like

United States District Court
Northern District of California

procedures and to understand and remember very short and simple instructions, and (2) he was markedly limited in his ability to understand and remember detailed instructions. (AR 693.)

In terms of sustained concentration and persistence limitations, Dr. Norbeck found that Mr. Dittenhafer was "not significantly limited" in his ability to do the following: (1) carry out very short and simple instructions; (2) sustain an ordinary routine without special supervision; (3) work in coordination with or in proximity to others without being distracted by them; and (4) make simple work-related decisions. (AR 693-94.) Dr. Norbeck found that Mr. Dittenhafer was "moderately limited" in his ability to do the following: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Norbeck found Mr. Dittenhafer "markedly limited" in his ability to carry out detailed instructions. (AR 693.)

In terms of social interaction, Dr. Norbeck found that Mr. Dittenhafer was not significantly limited in his ability to do the following: ask simple questions or request assistance; accept instruction and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 694.) He found Mr. Dittenhafer to be "moderately limited" in his ability to interact appropriately with the general public and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*)

In terms of adaptation, Dr. Norbeck found Mr. Dittenhafer to be not significantly limited in his ability to do the following: respond appropriately to changes in the work setting; be aware of normal hazards and to take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id.*)

## B. Mr. Dittenhafer's Testimony

Mr. Dittenhafer testified before the ALJ on May 23, 2013. (AR 32-72.)The ALJ first asked Mr. Dittenhafer about his work history at Citibank and at Wells Fargo. (AR 32.) The ALJ noted that Mr. Dittenhafer was found disabled in March 2004 and then worked for Wells Fargo in 2005.

Mr. Dittenhafer testified that he worked for Wells Fargo for a long time. (AR 33.) He assisted the tellers, handled cash, and worked with people. (*Id.*) Mr. Dittenhafer's last position at Wells Fargo was branch manager. (AR 32.) Mr. Dittenhafer testified that he left Wells Fargo "on disability." (AR 35.)

Mr. Dittenhafer worked for Citibank from 2005 to 2008, also as a branch manager. (AR 32.) Citibank fired Mr. Dittenhafer because he could not work the scheduled hours, he had trouble sitting and standing, and he had anxiety attacks with clients. (AR 45.) Mr. Dittenhafer said that he had severe concentration issues with the computer, he could not remember deadlines, and he could not think clearly. (AR 45-46.) The ALJ asked Mr. Dittenhafer whether his condition worsened during his time at Citibank. (AR 45.) Mr. Dittenhafer responded that he had been able to hide his condition for a time. (AR 45-47.) Mr. Dittenhafer did not work after leaving his position at Citibank. (AR 36.) Mr. Dittenhafer was not on the anxiety or ADHD medications at the time he worked for Wells Fargo and Citibank, except for possibly Wellbutrin. (AR 47-48.)

The ALJ questioned Mr. Dittenhafer about why he could not work. (*Id.*) Mr. Dittenhafer responded that he had tried to volunteer at an AIDS organization for about three months but that he could not show up on time and could not remember the instructions. (AR 37, 68.)  He also had trouble sitting long enough. (AR 37.) Mr. Dittenhafer said that he also had trouble being around people because of his anxiety. (*Id.*) Mr. Dittenhafer tried to take a class but could not "deal with the classrooms" and could not remember what time the class met. (AR 49.)

Mr. Dittenhafer testified that he gets "really depressed" and that when he was with his dying father, Mr. Dittenhafer had thoughts about wanting to die. (AR 37.) He said that he gets headaches, feels confused easily, and is not able to focus or concentrate a lot. (AR 37-38.)

The ALJ then asked Mr. Dittenhafer about his limitations on sitting. (AR 38.) Mr. Dittenhafer responded that he has back pain on the left, lower side of his back that expands out. (AR 38.) He stated that his ability to sit varies from day to day; some days he can sit for "a couple of hours" and some days he can sit for ten minutes. (*Id.*) He takes one or two Vicodin pills a week for the pain. (AR 38-39.) The pills do not help him much. (AR 39.)

As to his physical limitations, Mr. Dittenhafer said that 25 pounds was the maximum amount

1    he could lift. (AR 40.) He has problems standing and can only stand for a maximum of a half an

2    hour and can only walk for a block or two before he has to sit down. (AR 40-41.)

3        The ALJ then questioned Mr. Dittenhafer about his ADHD. Mr. Dittenhafer responded that he

4    takes Wellbutrin and Methylmetadate for his ADHD (AR 42.) For anxiety, he takes Xanax and

5    Lorazepam regularly and Clonezepam as needed. (AR 43.) He also takes Lexapro or Effexor and

6    Escitalopram for depression. (*Id*.) Mr. Dittenhafer takes antiretroviral medications, medications for

7    nausea and intestinal bowel syndrome, blood pressure medications, medication for psoriasis, and

8    medication to help him maintain his weight. (AR 44.) Mr. Dittenhafer stated that even with his

9    medications, he still has memory trouble and anxiety. (AR 48.)

10       The ALJ then questioned Mr. Dittenhafer about his travel back east in 2012. Mr. Dittenhafer

11   said that he had gone back east for a couple of months when his father was dying. (AR 50-51.) Mr.

12   Dittenhafer's brother dealt with the estate. (AR 51.)

13       Mr. Dittenhafer lives with a friend. (*Id*.) On a typical day he may not get up until mid-

14   afternoon. (AR 52.) He watches television. (*Id*.) He can do the laundry but does not need to do

15   other household chores because the place he lives is very small. (AR 52-53.) Mr. Dittenhafer

16   orders food to be delivered, or if he has to, shops late at night when no one is around . (AR 53.) He

17   drives rarely and finds driving difficult because of his anxiety. (AR 53-54.) He plays a computer

18   game. (AR 54-55.) He does not go the gym any longer. (AR 55.) He stopped going because he

19   found it a problem to be around the people and also because of back pain. (*Id*.) Mr. Dittenhafer

20   also has knee problems which prevent him from being able to kneel or crouch. (AR 62.)

21       Mr. Dittenhafer's counsel then asked Mr. Dittenhafer about his HIV symptoms. Mr.

22   Dittenhafer responded that he has muscle cramps, nausea, muscle weakness, night sweats,

23   urination issues, leg pain, joint pain, rashes, ringing in his ears, headaches, backaches, gas,

24   constipation, lack of energy, dry mouth, eye infections, and blurred vision. (AR 59.)

25       In terms of the lack of energy, Mr. Dittenhafer has sleeping problems, sleep apnea, and restless

26   leg syndrome. (AR 59-60). He takes naps during the day. (AR 59.) Mr. Dittenhafer said that he

27   has anxiety attacks at least once a day and is subject to "abnormal crying." (AR 60.) Mr.

28   Dittenhafer said that the nausea, crying, trouble concentrating, and memory loss might be side

effects of his medications. (AR 61.) When he has an anxiety attack he uses his headphones to calm himself down and has to immediately leave wherever he is. (*Id*.)

Counsel for Mr. Dittenhafer then asked him about his October 2011 examination by Dr. Pither and Robert McMillan. (AR 62.) Mr. Dittenhafer said that he met with Mr. McMillan and that he never met with Dr. Pither. (AR 63.) Mr. Dittenhafer stated that he was nervous during the meeting and started to have an anxiety attack. (*Id*.) Mr. McMillan asked Mr. Dittenhafer about drug use, and Mr. Dittenhafer said that he had taken Xanax and Clonezepam before the examination for his anxiety but he denied any illegal drug use. (AR 63-64.)

Mr. Dittenhafer then testified about his March 2011 arrest for possession of meth-amphetamine. (AR 64.) Mr. Dittenhafer stated that he was convicted for possession but not for use and that the drugs might have been in his jeans from a prior time (AR 64-65.) He testified that the last time he had used methamphetamine on a routine basis was three to five years before the hearing. (AR 50, 65.)

The ALJ then resumed questioning Mr. Dittenhafer. (AR 67.) She asked him about his arrest. He stated that the police found the methamphetamine in his jeans pocket at an X-Ray machine at the airport on his way to either Florida or Pennsylvania. (AR 68-69.) He was not able to take that trip because he was arrested. (*Id*.)

Mr. Dittenhafer travelled to Hong Kong in December 2010 where he visited with a friend's family. (AR 69-70.) He also took a trip to France. (AR 70-71.)

**C. Vocational Expert Testimony**

Vocational Expert John Kilcher testified by phone the hearing. (AR 26.) The ALJ first asked Mr. Kilcher to classify Mr. Dittenhafer's past work. Mr. Kilcher stated that Mr. Dittenhafer had been a branch manager and a head teller. (AR 72-73.) The ALJ posed a hypothetical to the VE whether an individual of Mr. Dittenhafer's age and education, could perform his past work if that person were able to do the following: (1) lift 10 pounds frequently and 20 pounds occasionally; (2) sit for six hours in an eight hour day; (3) stand/walk for two hours in an eight-hour day; (4) perform frequent postural functions including balancing, stooping, kneeling, crouching, and crawling; and (5) is limited to simple, routine, repetitive, unskilled work with only occasional

1     public contact. (AR 73.) The VE testified that such a person could not perform Mr. Dittenhafer's

2     past work. (*Id.*) That person could perform work as an assembler, a packager, or a sorter. (AR 73-

3     74.)

4          The ALJ then added to the hypothetical that the person would need the ability to alternate

5     sitting and standing every 30 minutes and to remain in the changed position for 30 minutes. (AR

6     74.) The VE testified that a person with those limitations could not perform Mr. Dittenhafer's past

7     work but could work as an assembler, packager, or sorter but that the number of available position

8     would be decreased as follows: assembler, decreased by 65%; packager, decreased by 70%; sorter

9     decreased by 45%. (AR 75.) The VE testified that he estimated the erosion of position availability

10    based on his 25 years of experience working in rehabilitation, doing job analysis and working with

11    employers. (AR 75-76.)

12         The ALJ then changed the hypothetical to include no public contact. (AR 76.) The VE

13    responded that the same jobs would be available as none of them required public contact. (*Id.*) The

14    ALJ added a final condition to the hypothetical that the individual would be off-task more than

15    15% of the work day due to interference from psychologically based symptoms. (*Id.*) The VE

16    testified that a person with that limitation could not perform any competitive work activity. (*Id.*)

17         Counsel for Mr. Dittenhafer added the following limitations of: no kneeling, crouching or

18    crawling; only occasional contact with co-workers and supervisors; unexcused lateness to work at

19    least found times a month; and off task 10% of the time. (AR 77.) The VE testified that a person

20    with those limitations could not perform any work. (*Id.*) The VE stated that the limitations which

21    would preclude the individual from working would be the lateness for work and the concentration

22    problems. (*Id.*)

23    **D. Administrative Findings**

24         The ALJ held that Mr. Dittenhafer's disability ended as of April 30, 2011. (AR 18.) The ALJ

25    first found that the most recent favorable medical decision finding that Mr. Dittenhafer was

26    disabled was dated December 17, 2004. (AR 10.) This decision is known as the "comparison point

27    decision" or "CPD." (*Id.*) At the time of the comparison point decision Mr. Dittenhafer's

28    medically determinable impairment was an affective disorder. (AR 10-11.)

United States District Court
Northern District of California

1      At step one, the ALJ found that following his determination of disability in 2004, Mr.

2  Dittenhafer engaged in substantial gainful activity from 2005 to 2008. (AR 11.) Mr. Dittenhafer

3  ceased working in 2008. (*Id.*)

4      At step two, the ALJ found that Mr. Dittenhafer had the following severe impairments:

5  "degenerative joint disease of the left knee, anxiety disorder, major depressive disorder, attention

6  deficit hyperactivity disorder ("ADHD") and methamphetamine abuse in sustained remission."

7  (*Id.*) The ALJ also found that while Mr. Dittenhafer had been diagnosed with HIV, AIDS,

8  hepatitis C and back pain, none of those impairments were severe. (*Id.*) The ALJ found that Mr.

9  Dittenhafer did not have an impairment or combination of impairments that met or medically

10  equaled a listing. (AR 11-13.) In making this determination, the ALJ first found that the medical

11  evidence of record did not support a finding that any physical impairment, either singly or in

12  concert, met or medically equaled a listing. (AR 11.)

13      The ALJ also found that the severity of Mr. Dittenhafer's mental impairments, considered

14  singly and in combination, did not meet or medically equal the listings 12.06 and 12.09. (AR 11-

15  13.) The ALJ found that Mr. Dittenhafer did not meet the "paragraph B" criteria. (*Id.*) To satisfy

16  the "paragraph B" criteria, the mental impairment must result in at least two of the following:

17  marked restrictions on activities of daily living; marked difficulties in maintaining social

18  functioning; marked difficulties in maintaining concentration, persistence, and pace; or repeated

19  episodes of decompensation, each of extended duration. (AR 11-12.)

20      First, the ALJ found that Mr. Dittenhafer had no restrictions on activities of daily living. (AR

21  14.) In reaching this decision, the ALJ relied on evidence in the record that Mr. Dittenhafer cares

22  for himself, watches television, does laundry and plays computer games. (AR 12.)

23      Second, the ALJ found Mr. Dittenhafer had only moderate difficulties in social functioning.

24  (*Id.*) The ALJ noted that while Mr. Dittenhafer reported that he was "uncomfortable in crowds,"

25  Mr. Dittenhafer also testified that he had travelled internationally to France and Hong Kong. (*Id.*)

26  The ALJ gave Mr. Dittenhafer's testimony the benefit of the doubt and found him moderately

27  impaired in social functioning. (*Id.*)

28      Third, the ALJ found that Mr. Dittenhafer had moderate difficulties with regard to

United States District Court
Northern District of California

1   concentration, persistence, and pace. (*Id.*) In so finding, the ALJ looked Mr. Dittenhafer's

2   testimony that he has difficulty meeting deadlines and being punctual, that he could not remember

3   which days the class he was taking met, and that anxiety kept him from completing appointed

4   tasks. (*Id.*)

5       The ALJ found that Mr. Dittenhafer experienced no episodes of decompensation of extended

6   duration. (*Id.*) The ALJ concluded that because Mr. Dittenhafer's mental impairments did not

7   cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of

8   decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. (*Id.*)

9       In addition, the ALJ found that Mr. Dittenhafer did not meet the "paragraph C" criteria of

10  listings 12.04 and 12.06, which require the following: (1) repeated extended episodes of

11  decompensation; (2) a residual disease process that has resulted in such marginal adjustment that

12  even a minimal increase in mental demands or change in the environment would be predicted to

13  cause the individual to decompensate or a current history of one or more years' inability to

14  function outside of a highly supportive living environment and an indication of continued need for

15  such an arrangement; and (3) a complete inability to function independently outside of one's

16  home. (*Id.*)  The ALJ found that the evidence failed to establish the presence of "paragraph C"

17  criteria of listings 12.04 or 12.06. (*Id.*)

18      At step three, the ALJ found that there had been a decrease in the medical severity of Mr.

19  Dittenhafer's affective disorder. The ALJ stated that the medical evidence supported a finding that

20  Mr. Dittenhafer's depression and anxiety were well-controlled with medication and that his moods

21  were stable. The ALJ found therefore that pursuant to 20 CFR 404.1594(b)(1)  "medical

22  improvement occurred as of April 30, 2011." (AR 13.)

23      At step four, the ALJ found that Mr. Dittenhafer's medical improvement was related to the

24  ability to work and that as of April 30, 2011 his comparison -point decision impairment no longer

25  met or medically equaled the made listing that was met at the time of the comparison-point

26  decision. (*Id.*) The ALJ stated that Mr. Dittenhafer could perform at least simple and repetitive

27  tasks. (*Id.*) The analysis then proceeded to step six.

28      At step six, the ALJ found that Mr. Dittenhafer continued to have a severe impairment or

United States District Court
Northern District of California

1    combination of impairments. (*Id.*)

2        At step seven, the ALJ found that Mr. Dittenhafer had the residual functional capacity to

3    perform light work with the following restrictions:  he could only frequently balance, stoop, crawl,

4    crouch or kneel; he must be allowed to alternate sitting or standing every thirty minutes; he must

5    be allowed to remain in position for 30 minutes; he was limited to simple, routine, repetitive,

6    unskilled work tasks; and he must work in an environment with no public contact. (*Id.*)

7        The ALJ first summarized at length Mr. Dittenhafer's testimony at the hearing. (AR 14-15.)

8    Based on his testimony the ALJ found that Mr. Dittenhafer's medically determinable impairment

9    could have reasonably been expected to produce the alleged symptoms, but that "his statements

10   concerning the intensity, persistence and limiting effects of [his] symptoms were not credible to

11   the extent they are inconsistent with the residual functional capacity." (AR 15.)

12       Regarding Mr. Dittenhafer's physical limitations, the ALJ found that his HIV was being

13   controlled with medication. (*Id.*) The ALJ gave Mr. Dittenhafer the benefit of the doubt regarding

14   his alleged side effects of residual fatigue, muscle pain and weakness, and back pain. (*Id.*) The

15   ALJ also found that the record evidenced degenerative changes in Mr. Dittenhafer's left knee and

16   on that basis found that he was capable of a reduced range of light work with limitations reflecting

17   his knee and back soreness. (*Id.*) The ALJ found these restrictions were also consistent with the

18   opinions of the state agency consultants, and with Mr. Dittenhafer's testimony. (*Id.*)

19       As to Mr. Dittenhafer's mental health impairments, the ALJ found that the record did not

20   support the existence of an impairment as severe as Mr. Dittenhafer alleged. (*Id.*) The ALJ noted

21   that the treatment records "consistently note that [Mr. Dittenhafer's] moods seem stable" on his

22   medications and had been for a number of years. (*Id.*) The ALJ credited Mr. Dittenhafer's

23   testimony that the ADHD medications were not successful in controlling his ADHD, and on that

24   basis found "some erosion of [Mr. Dittenhafer's] ability to concentrate and follow through with

25   tasks." (*Id.*)

26       The ALJ gave little weight to the opinion of psychological consultative examiner Dr. Pither,

27   who had reported that Mr. Dittenhafer demonstrated significant functional limitations and that Mr.

28   Dittenhafer was only marginally capable of caring for himself. (AR 15-16.) Dr. Pither had also

United States District Court
Northern District of California

1   found that Mr. Dittenhafer had an extremely low IQ and may have been dependent on

2   methamphetamine at the time of the examination. (AR 16.)

3       The ALJ found that nothing in the record was consistent with Dr. Pither's conclusions. (AR

4   15-16.) The ALJ rejected Dr. Pither's low IQ finding as inconsistent with Mr. Dittenhafer's work

5   history as a bank manager. (AR 16.) The ALJ found Dr. Pither's opinion regarding possible

6   methamphetamine use inconsistent with Mr. Dittenhafer's vigorous denial of drug use at the

7   hearing and hearing testimony that he had been sober since 2010. (*Id.*) The ALJ noted Mr.

8   Dittenhafer's testimony that he had never met with Dr. Pither and met only with Mr. McMillan

9   who also signed Dr. Pither's report. (*Id.*) Because the ALJ found Dr. Pither's report "deeply

10   incongruous" with the record as a whole, she gave it little weight. (*Id.*)

11       The ALJ gave great weight to the opinion of the state agency consultant who found Mr.

12   Dittenhafer to be only moderately impaired. (*Id.*) In so doing, the ALJ credited Mr. Dittenhafer's

13   testimony that he was not under the influence of drugs and so discounted any reliance by the state

14   agency consultant on Dr. Pither's prior findings of drug addiction. (*Id.*)

15       The ALJ further found that a determination of only moderate impairment was bolstered by Mr.

16   Dittenhafer's testimony that he had worked in a supervisory capacity from 2005 to 2008 and that

17   he had traveled to Hong Kong and France. (*Id.*) Finally, the ALJ found that Mr. Dittenhafer was

18   not able to perform his past relevant work. (*Id.*)

19       At step eight, the ALJ found that Mr. Dittenhafer had the residual functional capacity to

20   perform unskilled light work with additional limitations. (AR 17.) The ALJ credited the VE's

21   testimony that a significant number of jobs in the national economy existed that Mr. Dittenhafer

22   could perform. (*Id.*) The ALJ found therefore that Mr. Dittenhafer's disability had ended as of

23   April 30, 2011. (*Id.*)

24                                      **ANALYSIS**

25   **I. STANDARD OF REVIEW**

26       Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

27   Commissioner if the plaintiff initiates the suit within sixty days of the decision. District courts

28   may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal

United States District Court
Northern District of California

1    error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g);

2    *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence

3    means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

4    reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d

5    1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's

6    decision and a different outcome, the court must defer to the ALJ's decision and may not

7    substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir.

8    1999).

9    **II. APPLICABLE LAW: EIGHT STEPS TO DETERMINE DISABILITY**

10        An SSI claimant is disabled if (1) he suffers from a "medically determinable physical or

11   mental impairment which can be expected to result in death or which has lasted or can be expected

12   to last for a continuous period of not less than twelve months," and (2) the "impairment or

13   impairments are of such severity that he is not only unable to do his previous work but cannot,

14   considering his age, education, and work experience, engage in any other kind of substantial

15   gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

16        There is an eight-step analysis for determining whether a claimant continues to be disabled

17   within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1594(f)(1)-(9). The eight steps

18   are as follows:

19        **Step One:** Is the claimant presently working in a substantially gainful activity? If so, the
         disability will be found to have ended. If the claimant is not working in a substantially
20       gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation
         proceeds to step two. *See* 20 C.F.R. § 404.1594(f)(1)
21

22        **Step Two**: Does the claimant's impairment(s) meet or equal the criteria in any of the
         impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (a.k.a., "the Listings"; 20
23       CFR § 404.1520 (d) (2012)). If so, the claimant continues to be disabled, and the
         evaluation stops. If not, proceed to step 3. *See* 20 C.F.R. § 404.1594(f)(2)

24        **Step Three**: Has there been medical improvement of the claimant's impairment(s) since
         the comparison point decision? If medical improvement has occurred, proceed to step 4. If
25       medical improvement has not occurred, proceed to step 5. *See* 20 C.F.R. § 404.1594(f)(3)

26        **Step Four**: If there has been medical improvement, is it related to the ability to work? If
         the medical improvement is related to the ability to work, proceed to step 6. If the medical
27       improvement is not related to the ability to work, proceed to step 5. *See* 20 C.F.R. §
         404.1594(f)(4)
28

**Step Five**: If there has been no medical improvement or the medical improvement is not related to the ability to work, do any of the exceptions to the medical-improvement standard apply? If none of the exceptions applies, the claimant will be found disabled. If an exception applies, proceed to step 6. *See* 20 C.F.R. § 404.1594(f)(5)

**Step Six**: Is the claimant's impairment or combination of impairments severe? In other words, does the claimant's impairment or combination of impairments significantly limit the claimant's ability to do basic work activities? If not, the claimant's disability will be found to have ended. If the claimant's impairment is severe, proceed to step 7. *See* 20 C.F.R. § 404.1594(f)(6)

**Step Seven**: Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If the claimant can do his or her past relevant work, the disability will be found to have ended. If the claimant cannot do her/his past relevant work, proceed to step 8. *See* 20 C.F.R. § 404.1594(f)(7)

**Step Eight**: Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work? If so, the claimant's disability will be found to have ended. If not, the claimant will be found to continue to be disabled. *See* 20 C.F.R. § 404.1594(f)(8)

When a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical requirements have improved to the point where he is able to perform substantial gainful activity. *See* 42 U.S.C. § 423(f)(1); *Marrs v. Espinoza*, No. 5:15-cv-00921-PSG, 2015 WL 1224831, at *3 (N.D. Cal. Mar. 17, 2015) (citation omitted). The continued entitlement to benefits depends on a two-part evaluation process: (1) whether "'there has been any medical improvement in the [individual's] impairments,'" and if so, (2) "'whether this medical improvement is related to [the individual's] ability to work.'" *Marrs*, 2015 WL 1224831 at * 3 (quoting 20 C.F.R. § 404.1594(b)). Under part one, "'medical improvement" is "any decrease in the medical severity of [the individual's impairment [] which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled.'" *Id.* (quoting *Kennedy v. Astrue*, 247 Fed. Appx. 761, 764 (6th Cir. 2007) (citing 20 C.F.R. § 404.1594(b)(1))). "'A determination that there has been a decrease in medical severity must be based on changes (improvements) in the symptoms, signs and/or laboratory findings associated with the [individual's] impairment[] . . . . If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding "increase in [the claimant's] functional capacity to do basic work activities." *Id.* (quoting *Kennedy*, 247 Fed. Appx. at 765 (quoting 20 C.F.R. §§ 404.1594(b)(3) & 404.1594(b)(1)(i)))). Under part two, the focus is on whether the

United States District Court
Northern District of California

individual has the ability to engage in substantial gainful activity. *Id.* (citing *Kennedy*, 247 Fed. Appx. at 765.)

"SSI benefits claimants have the burden of proving disability. *Lida v. Heckler*, 705 F.2d 363, 365 (9th Cir. 1983); *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982). Once a claimant has been found to be disabled, however, a presumption of continuing disability arises in his favor. *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983); *Patti v. Schweiker*, 669 F.2d 582, 586-587 (9th Cir. 1982). The Commissioner then bears the burden of producing evidence sufficient to rebut this presumption of continuing disability. *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983); *see Marrs*, 2015 WL 1224831 at * 3 (in the cessation analysis, the "'ultimate burden of proof lies with the Commissioner in termination proceedings'") (quoting *Kennedy*, 247 Fed. Appx. at 765(citing 20 C.F.R. § 404.1594(b) and (f)(7))). An increase in a claimant's functional capacity leads to a cessation of benefits only if, as a result of any increase, the claimant can perform past work or other work that exists in significant numbers in the national economy. *Id.* (citing 20 C.F.R. § 404.1594(f)(7)).

As a rule, the Social Security Administration favors opinions of treating physicians over non-treating physicians. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). The Social Security Administration defers to treating physicians because they are employed to cure and have a greater opportunity to know and observe their patients. *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). The conclusions of the treating physician are not necessarily conclusive, however. *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7. (9th Cir. 1989)).

### III. APPLICATION

Mr. Dittenhafer alleges a single error by the ALJ. (MSJ, ECF No. 21). Mr. Dittenhafer argues that the ALJ erred by not including Mr. Dittenhafer's moderate limitations on concentration, persistence, or pace  into her determination of his residual functional capacity and in her hypotheticals to the VE. (*Id.*) In so arguing, Mr. Dittenhafer asserts that the ALJ's limitation to simple, routine, repetitive, unskilled work does not adequately capture Mr. Dittenhafer's

United States District Court
Northern District of California

limitations on concentration, persistence, or pace. (*Id*.)

The ALJ found that Mr. Dittenhafer had "only moderate difficulties" with regard to concentration, persistence, or pace. (AR 12, noting his allegations regarding difficulty meeting deadlines, being punctual, and keeping appointed tasks.) She additionally stated that as to his ADHD, "the claimant has tried a number of medications without, as he reports, success. It is a reasonable conclusion that that impairment, uncontrolled, would cause some erosion of the claimant's ability to concentrate and follow through with tasks." (AR 15.)

The ALJ posed four hypotheticals to the VE. (AR 73-76.) The first two hypotheticals contained the same mental limitation, namely that the person would be limited to simple, routine, repetitive, unskilled work with occasional public contact.[3] (AR 73-74.) (As discussed above, both resulted in available other work as an assembler, packager, and a sorter (with the jobs number eroded in hypothetical two because of additional physical limitations). The third hypothetical contained the additional mental limitation that the person could have no contact with the public, and that did not change the available jobs from hypothetical two. (AR 76.) The fourth hypothetical added the limitation that the person would be off-task more than fifteen percent of the work day due to psychologically based symptoms. (*Id*.) In response to this hypothetical, the VE responded that an individual with those limitations would not be able to perform any competitive work activity. (*Id*.) The ALJ found that Mr. Dittenhafer had the residual functional capacity to perform light work with some physical limitations and that he was mentally limited to simple, routine, repetitive unskilled work, with no public contact. (AR 13.) Based on the VE's responses to her hypotheticals, the ALJ concluded that there were a significant number of jobs in the national economy that Mr. Dittenhafer could perform with those limitations, and therefore he was not disabled. (AR 17.) The ALJ did not include an explicit limitation on concentration, persistence, or pace into the first three hypotheticals. As the plaintiff notes, she did in the fourth hypothetical by including being "off task more than 15 percent," which was a greater limitation than the plaintiff had. (Motion, ECF No. 21 at 6.)

---

[3] Mr. Dittenhafer does not appeal any of the physical limitations of the RFC determination (summarized above in the section on Vocational Expert Testimony.

United States District Court
Northern District of California

"A hypothetical question posed to a vocational expert must 'include all of the claimant's functional limitations, both physical and mental.'" *Brink v. Commissioner Social Sec. Admin.*, 343 Fed.Appx. 211, 212 (9th Cir. 2009) (quoting *Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995)). "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993)); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Mr. Dittenhafer argues that the ALJ needed to incorporate into her hypotheticals his limitation in the ability to concentrate, persist, or keep pace. (Motion, ECF No. 21 at 6.) The Commissioner responds that the RFC was sufficient because the ALJ "translated those 'moderate' limitations into concrete functional limitations that limited Plaintiff to simple routine, repetitive unskilled work tasks . . . in an environment with no public contact." (Cross-Motion, ECF No. 22 at 4.)

"An ALJ may synthesize and translate assessed limitations into an RFC assessment without necessarily repeating each functional limitation verbatim in the RFC assessment." *See Martin v. Astrue*, No. 2:12-cv-0033-KJN, 2013 WL 552932, at *8 (E.D. Cal. Feb 13, 2013) (citing *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1173–74 (9th Cir. 2008)); *see also* 20 C.F.R. § 404.1545 (defining RFC as "the most you can still do despite your limitations"). The Ninth Circuit has held that an RFC that limits the claimant to "unskilled work" does not in and of itself capture limitations of concentration, persistence, and pace. *Lubin v. Comm'r Social Sec. Admin.*, 507 Fed.Appx. 709, 712 (2013); *Brink,* 343 Fed.Appx. at 212 (simple, repetitive work does not encompass difficulties with concentration, persistence or pace). But "moderate mental limitations are not necessarily inconsistent with an RFC for simple repetitive tasks as long as such an assessment is generally consistent with the concrete restrictions identified in the medical evidence." *Martin*, 2013 WL 552932, at *8 (citing *Stubbs–Danielson*, 539 F.3d at 1174).

In *Stubbs-Danielson* and this case, doctors found the claimants to be not significantly limited in the ability to carry out very short and simple instructions and to sustain an ordinary routine without special supervision. (AR 693.) *See Stubbs-Danielson*, 539 F.3d at 1174. And both

claimants had moderate limitations in the ability to perform at a consistent pace without an unreasonable number of rest periods. (AR 694.) *See Stubbs-Danielson*, 539 F.3d at 1174. But in *Stubbs-Danielson*, the doctor found the claimant to be able to "maintain attention and concentration for extended periods." *Id.* By contrast, here Dr. Norbeck found Mr. Dittenhafer to be "moderately limited in the ability to maintain attention and concentration for extended periods. (AR 693.) Dr. Norbeck also found Mr. Dittenhafer to be moderately  limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (AR 693.) In *Stubbs-Danielson*, the ALJ specifically discussed each assessed limitation. 539 F.3d at 1173-74. By contrast, the ALJ did not discuss these limitations in Dr. Norbeck's assessment (an assessment that the ALJ gave great weight). The court cannot conclude on this record and this argument that the ALJ accounted for the limitations in her RFC. The court thus remands so that the ALJ may pose hypotheticals that include Mr. Dittenhafer's moderate limitations in the ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

### CONCLUSION

The court grants Mr. Dittenhafer's motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands the case for further administrative proceedings.

**IT IS SO ORDERED.**

Dated: September 30, 2015

_____
LAUREL BEELER
United States Magistrate Judge